KIRKSEY *vs.* FIKE.

[BILL IN EQUITY FOR SPECIFIC PERFORMANCE OF AWARD ON SETTLEMENT OF
PARTNERSHIP ACCOUNTS.]

1. *Bill not sustainable under act of 1846 giving attachments in chancery.*—A bill cannot be sustained under the act of February 5, 1846, "providing for attachments in chancery", when there is no allegation of indebtedness to any specific amount, and no affidavit that any particular sum is due.

2. *But sustained to enforce specific performance of award.*—Bill filed by partne against his co-partner in a tannery; alleging arbitration and award of partnership transactions, and insolvency of defendant; and asking an injunction, attachment, account, discovery and general relief. By terms of award, as alleged, partnership accounts, leather and skins on hand, and use of vats, were to be equally divided between the parties: *Held,* that the bill might be sustained, independent of the defendant's insolvency, for the purpose of enforcing the specific performance of the award, since a court of law could not afford full redress.

3. *Jurisdiction of equity to enforce specific performance of awards.*—Although equity will not compel the specific performance of an award, when the damages resulting from the failure to perform are capable of being exactly measured, and complete redress afforded at law; yet it is not enough to bar the interence of equity, that the party may successfully maintain an action at law upon the award—he must be able to obtain by a verdict all that it was the object of the award to give him.

APPEAL from the Chancery Court of Talladega.

Heard before the Hon. JAMES B. CLARK.

THIS bill was filed by Isaac Kirksey against Harlan Fike, and alleged, substantially, the following facts :

In November, 1847, Kirksey and Fike entered into co-partnership in the tanning business, but did not commence their operations until the fall of 1848. By the terms of the partnership, which were reduced to writing, and which are alleged to have been destroyed by Fike, Kirksey was to put in a negro man to work against Fike ; and they were to open the yard, sink the vats, erect all necessary buildings, and prepare with their joint labor all things necessary to carry on the work. It was further agreed, that each partner should have one-half of the profits of the concern ; if hides were received to tan on shares, the part which fell to them was to be divided ; and

when Kirksey furnished hides to the yard at his own expense, he was to have three-fourths of the proceeds of the leather at the termination of the partnership, which was to continue five years; and the tan-yard, with all its appurtenances and fixtures, was to become the sole property of Kirksey at the termination of the partnership.

The yard was opened, and the vats were sunk; and the business was managed solely by Fike, who also kept the books of the concern; but he kept them so badly that Kirksey could not understand them, nor gather any correct information from them. Kirksey furnished a large amount of hides, but kept no account of them, and he does not know whether the memorandum kept by Fike was correct; a large amount of hides were also received from other persons to be tanned on shares. Fike went into the business without means, and all the hides which he purchased are charged to have been bought with the proceeds of the tan-yard. In November, 1851, Kirksey attempted to have a settlement with Fike of their partnership matters, but they were unable to agree; and thereupon they referred the settlement to three arbitrators, and each took an oath to abide by the award. The award was made in writing, but Kirksey has not the possession of it. According to his best recollection, and the information of one of the arbitrators, its terms were as follows: "That Fike should make a fair exhibit of everything in the tan-yard, up to June 1, 1851, and should divide all the leather in tan and all on hand which was tanned; that he should exhibit his books, and make a fair and equal division of the accounts due upon them; that Fike should have the liberty of using one half of the vats in the tan-yard until his contract should expire, and Kirksey should have the use of the other half."

Fike stated to the arbitrators, that there were on the books of the firm from $1400 to $1500 of good accounts, and the same amount in leather on hand, finished and in tan, up to said June 1, 1851; and Kirksey, although entitled to more than one-half of this sum, is willing to abide by the award. Fike further stated to said arbitrators, that he had worked in on one side of the yard, after June 1, 1851, a large amount of hides purchased with his own means, with others which he had taken to tan on shares, and that none of the leather or

hides on that side of the yard belonged to said firm; but Kirksey charges that these statements were false, and intended to deceive the arbitrators, and that all these hides, except a few taken on shares to tan for other persons, were purchased with the means of the firm, which Fike was attempting to convert to his own use.

After said award was made, Kirksey sent his agent to Fike, to receive his half of the leather and accounts awarded to him; and Fike delivered to said agent one-half of the leather on one side of the yard, not exceeding in value $400, and $43 in accounts, of which the greater part is entirely worthless. Kirksey has notes on Fike, for money and provisions furnished him, on which Fike has made some payments; and this is all that Kirksey has received from the firm. Fike has been and is disposing of all the leather in the yard, with the view of defrauding Kirksey. He now has on hand 150 pieces of leather, worth $300, and three vats of leather, each worth $60; which have been procured by him from the profits of the joint business, and which are liable in equity to satisfy Kirksey's said demand on the partnership. Fike claims this leather as his own, is using and disposing of it for his own use and benefit, and is preparing to remove it from the yard, so that Kirksey will be without any remedy or means of indemnification. Fike is insolvent, and has no means out of which the money due Kirksey on a settlement of the partnership business can be made, unless the leather in his hands can be subjected; and he is fraudulently disposing of said property, with the view of defeating the collection of said demands.

The bill prays for an injunction, attachment, discovery and production of books and accounts, account of partnership transactions, and for general relief.

The chancellor sustained a demurrer to the bill for want of equity, and his decree is now assigned for error.

JOHN T. MORGAN, for the appellant.

WHITE & PARSONS, *contra.*

GOLDTHWAITE, J.—The bill cannot be sustained under the act of 5th February, 1846, (Acts 1845–6, 17,) as there is no indebtedness to any specific amount charged, nor any affi-

davit that any particular sum is due.—McGown v. Sprague, 23 Ala. 524.

We think, however, it can be sustained for the purpose of specifically enforcing the award. It is true, that if the damages resulting from the failure of Fike to perform were capable of being exactly measured, and complete redress could be afforded at law, equity would not interfere.—Story's Equity, (3 ed.) §§ 717a, 718; Savary v. Spence, 13 Ala. 561. In the present case the bill charges the insolvency of Fike; and we are by no means certain that, under the special circumstances of this case, that fact would not give the complainant the right to call upon a court of equity to enforce the award specifically.—Deloret v. Rothschild, 1 Sim. & Stu. 590. But, waiving the discussion of this question, we are of opinion, that the jurisdiction of the court can be sustained upon the award itself. To bar the interference of equity, it is not enough that the party might successfully maintain an action at law upon the award. The question is, could he by a verdict obtain all that it was the object of the award to give him? If he could not, then it would seem indispensable to justice that he should obtain it by a specific performance. In contracts for the sale of stocks, or goods, the reason why equity will not, in general, enforce them specifically, is, that the goods and stocks have usually a certain marketable value, and the purchaser can, on the breach of the contract, supply himself; and the money he would expend in the purchase of the quantity contracted for, with interest, would be given in the way of damages at law.—Story's Eq., § 717. But where there are special circumstances, operating as an inducement to the contract, which a court of law could not look at in giving damages, the case would be different. Thus, where a ship-carpenter purchased a large quantity of timber near his yard, for the purpose of carrying on his business; as the market value of such timber, differently situated with respect to his yard, would not fully compensate him, it would be a proper case for specific performance.—Buxton v. Lister, 3 Atk. 384, 385; Adderley v. Dixon, 1 Sim. & Stu. 607. So, here, the complainant was engaged in the business of tanning; he was to receive one-half of the skins in the yard, as well as of the leather, and was also to have the use of one-half of the vats.

It is fair to presume, that the award had relation to his business—that it contemplated his tanning the skins and selling the leather; and although a court of law might give him their value, and allow him for the use of the vats, it could not look to the profits he might have derived from them in the business, or the losses he might sustain from the failure of the other party to perform *in specie;* and thus he could not, in a court of law, obtain full compensation.

Decree reversed, and cause remanded.